## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MR. AND MRS. P. ON THEIR OWN | : | |
| BEHALF, AND AS NEXT FRIENDS | : | |
| OF M.P., | : | |
|     PLAINTIFFS, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:14-cv-1697 (VLB) |
| WEST HARTFORD BOARD OF | : | |
| EDUCATION, et al., | : | |
|     DEFENDANTS | : | September 29, 2016 |


**MEMORANDUM OF DECISION DENYING PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [Doc. #32], AND GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT [DOC. #34]**

The Plaintiffs, Mr. and Mrs. P. ("Parents"), on their own behalf and as next friends of M.P. ("Student"), bring this action against the West Hartford Board of Education, Superintendent Tom Moore, and Director of Pupil Services Glenn McGrath (collectively, the "Board") to appeal in its entirety an October 2, 2014 final decision, issued by a Due Process Hearing Officer ("Hearing Officer"), that (i) the Board provided adequate Free Appropriate Public Education ("FAPE") to Student from the fall semester of 2011 through summer 2014; (ii) the Board failed to propose appropriate transportation for Student for the 2014-2015 school year; (iii) the Board's procedure was appropriate as to (a) identifying Student in a timely manner; (b) providing appropriate evaluations; and (c) implementing appropriate transition planning; and (iv) the Board's procedure was lacking, but did not deny Student FAPE or deny Parents a meaningful opportunity to participate, as to (a) keeping incomplete IEP documents and (b) failing to provide consistent programming for Student.  [Dkt. No. 32 ("Mot.") at 12-13.]

1

Now Before the Court is Parents' Motion for Summary Judgment on the Administrative Record as to counts one and five of Plaintiffs' Second Amended Complaint [Dkt. No. 27 ("SAC")], requesting that the Court reverse the decision of the Due Process Hearing Officer and award Student compensatory education in the form of placement in the Options program, and reasonable attorney's fees and costs. Mot. at 1. Also before the Court is the Board's Cross-Motion for Summary Judgment on the Administrative Record as to all counts of the SAC, and for dismissal of Superintendent Thomas Moore and Director of Pupil Services Glenn McGrath as defendants for failure to state any claims against them as individuals. [Dkt. No. 34 ("Cross-Motion").] Parents consent to dismissal without prejudice of counts two, three, and four of their Complaint. [Dkt. No. 38 ("Plaintiffs' Sur-Reply") at 1 n.2.] Because Parents do not allege any causes of action against Messers. Moore or McGrath in their individual capacities, the Court also dismisses them as individual defendants, without prejudice.

I.  Facts

The following statement of facts is based on the exhibits and testimony that comprised the administrative record presented to the Hearing Officer. [Dkt. No. 21 ("Administrative Record")].

Student began his sophomore year at Hall High School in West Hartford in fall 2011. 6/9/2014 Hearing Transcript (Mother's testimony) at 63-64. Over the course of the school year, Student's grades declined. *Id.* at 66-67. In December 2011, Student was hospitalized for suicidal ideation. *Id.* at 66-67. Parents notified the Board of Student's hospitalization for suicidal ideation, and on December 8,

2011 the Board met with Parents to discuss reducing Student's workload and assisting him with organizational skills.  *Id.* at 69-71.[1]

On January 31, 2012, the Board held a meeting under Rehabilitation Act Section 504, and determined Student was eligible for accommodations due to Attention Deficit Hyperactivity Disorder ("ADHD").  *Id.* at 71; Ex. B-2 (504 Meeting record).  Student's school attendance declined in February 2012, and the Board arranged homebound tutoring for Student.  6/9/2014 Hearing Transcript (Mother's testimony) at 73.

Parents referred Student for special education in March 2012, and in response, the Board held a PPT.  Ex. B-3 (3/12/2012 PPT record).  The PPT considered Student's declining grades in the second semester of his sophomore year, and Student's beginning behavioral improvement due to medication.  *Id.* The Board determined the duration of Student's condition was not yet prolonged enough to qualify for special education, but scheduled a follow-up PPT for April 23, 2012.  *Id.*

At the April 23, 2012 meeting, Parents alerted the Board that Student had been hospitalized for aggressive ideation.  Ex. B-4 (4/23/2012 PPT record).  The PPT considered Student's hospitalization due to emotional concerns and aggressive thoughts, Parents' statement that Student's psychiatric medications were helping, and Student's ongoing homebound tutoring.  *Id.*  The PPT decided to increase Student's homebound tutoring to eight hours per week, and have Student evaluated for eligibility for special education.  *Id.*

---

[1] Minutes from the December 8, 2011 meeting are not provided in the record.

3

On May 9, 2012, the Hall High School psychologist evaluated Student.  Ex. B-5 (5/9/2012 Evaluation).  The Hall psychologist administered BASC-2, an evaluation which asked teachers, Parents, and Student a series of questions to determine behavioral and emotional issues.  *Id.*  The Hall psychologist's report also noted Student's hospitalizations, experiences with therapy, absences from school, and general outlook.  *Id.*  Ultimately, the Hall psychologist found that "given [Student's] psychiatric diagnoses and school refusal behavior it is recommend the PPT explore the possibility of a special education mandate under the category of Emotional Disturbance."  *Id.*

On May 10, 2012, the District psychiatrist conducted a consultation consisting of an interview with Student.  Ex. B-6 (5/10/2012 Evaluation).  He noted that Student was hospitalized in December 2011 for suicidal ideation and was diagnosed with ADHD while admitted, and was subsequently hospitalized and medicated for homicidal ideation.  *Id.*  In addition, the District psychiatrist considered that Student was failing four classes at the time and suffered from panic attacks consisting of palpitations, shortness of breath, sweaty palms, and nausea, and the panic attacks subsided when he began homebound tutoring in January 2012.  *Id.*  The District psychiatrist concluded Student might have Asperger's Disorder and Reactive Attachment Disorder and recommended he participate in STRIVE, an alternative high school special education program (discussed further below).  *Id.*

The PPT met again on May 17, 2012 to review the results of these examinations, and at a June 11, 2012 meeting declared Student eligible for special education.  Ex. B-8 (6/11/2012 PPT record).

At a June 19, 2012 meeting, the PPT placed Student in STRIVE for the 2012-2013 school year, Student's junior year.  B-9 (6/19/2012 PPT record).  Students enrolled in STRIVE are subject to the same graduation requirements as other students in the West Hartford Public School System; they study modified versions of the same academic curriculum and receive tutoring as needed to prepare for the Connecticut Academic Performance Test ("CAPT"), passage of which is a factor in determining all students' eligibility to graduate.  Ex. B-31 (STRIVE policy); Ex. B-39 (CAPT synopsis).  STRIVE uses individualized educational plans ("IEPs"), functional behavioral analyses, and behavioral intervention plans designed for each student at a PPT meeting to develop programming to meet his or her academic, social, emotional, and behavioral needs.  Ex. B-32 (STRIVE student handbook).

The faculty at STRIVE each have between 16 and 30 years' experience working with socially and emotionally troubled youth.  STRIVE's program coordinator, Michael Davis, has a Master of Arts in Special Education and 16 years' experience teaching students with severe social and emotional disabilities.  Ex. B-32 (Davis resume).  Edward Dillon, STRIVE's supervisor, has a Master's in Special Education, has been recognized for excellence in teaching, and has approximately 30 years' experience educating or developing programming for socially and emotionally maladjusted students, including collaborating with

paraprofessionals.  B-27 (Dillon resume).  STRIVE teacher Jamie Urso also has a

Master's in Special Education and 16 years' teaching special education.  B-25

(Urso resume).  Lorri Fitzsimmons, the social worker for STRIVE and ACHIEVE

(discussed below), has a Master's of Social Work and over 20 years' experience

providing crisis prevention, intervention, and treatment.  B-28 (Fitzsimmons

resume).  Neil Cummings, the transition coordinator for both STRIVE and

ACHIEVE, has over 30 years' experience providing vocational training and

counseling to people with mental illness or social instability.  B-29 (Cummings

resume).

On September, 20, 2012, a PPT reviewed Student's initial progress in

STRIVE and reviewed an independent neuropsychological evaluation Parents

obtained over the summer.[2]  Ex. B-12 (6/20/2012 PPT record).  Based on that

information, the PPT confirmed STRIVE was appropriate for Student for the 2012-

2013 school year.  *Id.*

In March 2013, Student successfully took the state-wide CAPT required of

all Connecticut public school students before graduation.   Ex. B-39 (Student's

CAPT scores and test information).[3]  Student scored at the "proficient" level in

math and reading and the "goal" level in science and writing.  *Id.*  A score of

proficient "demonstrate[s] an adequate understanding of the . . . concepts and

skills expected of Connecticut high school students."  *Id.*  A score of "goal"

---

[2] The PPT meeting minutes indicate the Board considered the neuropsychological
evaluation, which found Student emotionally disturbed and possibly Autistic, but
there is no record of what the discussion entailed.
[3] Student sat unsuccessfully for the CAPT his sophomore year, failing to finish
the test and receiving no scores.  Ex. B-22 (Student's nullified 2012 test scores).

"demonstrate[s] a strong understanding of the . . . concepts and inquiry skills expected of Connecticut high school students."[4] *Id.*

On May 22, 2013, at the end of Student's junior year, the Board held another PPT and determined that, based on Student's performance in STRIVE, Student should rejoin regular education classes at Hall High School for his senior year.  B-13 (5/22/2013 PPT record).

Student's reentry into regular education was not successful, and he was placed back in the STRIVE program after an October 28, 2013 PPT meeting.  B-14 (10/28/2013 PPT record).  In December 2013, while in the STRIVE program, Student experienced a severe violent outburst, punching another student until he broke his hand, and was suspended for one week.  6/9/2014 Hearing Transcript (Mother's Testimony) at 140-141.

On February 4, 2014, the PPT met to discuss transitional programming to prepare Student for vocational pursuits.  Ex. B-15 (2/4/2014 PPT record).  The PPT determined Student should attend half-days at STRIVE and spend afternoons with a job coach.  *Id.*  Parents declined the vocational training proposed with the STRIVE program, and instead requested an alternative transitional program called Options.  *Id.*  Student was ultimately enrolled in the STRIVE program through the remainder of his senior year, without afternoon vocational training.  *Id.*

---

[4] Although there is no record that the statistics were provided to the Hearing Officer, it is noteworthy that the year Student successfully took the CAPT, 78.6% of Connecticut students scored as proficient on the math portion, 81% scored proficient on the reading portion, 49% scored goal on the science portion, and 62.1% scored goal on the writing portion.  CAPT Data, *available at* http://solutions1.emetric.net/CAPTPublic/CAPTCode/Report.aspx.

On May 19, 2014, Student was again hospitalized, for 9 days, due to a homicidal outburst.  6/9/2014 Hearing Transcript (Mother's Testimony) at 180-81. The hospital sent the Board Student's discharge summary, indicating the dates he was admitted and that he was no longer deemed a danger to self or others. Ex. B-45.  Parents also notified the Board of Student's hospitalization before he was discharged, and provided further records of the hospitalization to the Board at an unspecified later date, when Parents received them from the hospital. 6/9/2014 Hearing Transcript (Mother's Testimony) at 181.

On June 2, 2014, a PPT determined that Student had met the course requirements to graduate, and developed plans to transition Student to post-secondary education.  Ex. B-52 (record of 6/2/2014 PPT).  The PPT recommended that Student enroll in ACHIEVE, a post-secondary program run by the West Hartford Public Schools for students requiring additional training to prepare to join the workforce.  *Id.*

ACHIEVE teaches daily living skills such as cooking and maintaining personal finances, and sends students to job sites three to four days per week to develop employability, interpersonal skills, and experience. Ex. B-46 (ACHIEVE policy and mission statement).  In students' first year at ACHIEVE, they work three days per week with full staff support.  *Id.*  In their second year, they work three days per week with staff support as necessary.  *Id.*  In their third year, they work four days per week with the goal of independence from on-site staff support.  *Id.*  Student's June 2, 2014 PPT indicated that ACHIEVE would provide Student the opportunity to receive individual or group counseling and a one-on-

one job coach.  Ex. B-52 (6/2/2014 PPT record).  82% of ACHIEVE graduates go on to secure full-time employment, part-time employment, or to take college courses. Ex. B-49 (ACHIEVE graduate data).

ACHIEVE employs a small staff with 14 to 30 years' experience working with students with emotional and social needs.  Beth Pettinelli, who teaches at ACHIEVE, develops programming, trains support staff, serves as a job coach, and evaluates students, has a Master's in Special Education and has worked at ACHIEVE since 1998.  Ex. B-26 (Pettinelli resume).  ACHIEVE employs two paraprofessionals who have worked with ACHIEVE for 14 years and 25 years, respectively.  7/7/2014 Hearing Transcript (Pettinelli testimony) at 64.  Ms. Fitzsimmons and Mr. Cummings, STRIVE's social worker and transition coordinator, also work with ACHIEVE students.  Exs. B-28 (Fitzsimmons resume) and B-29 (Cummings resume).

Parents expressed concern that ACHIEVE would not be sufficiently individualized for Student, and that ACHIEVE staff would not be sufficiently equipped to meet Student's social and emotional needs.  6/9/2014 Hearing Transcript (Mother's Testimony) at 173-74.  Parents instead requested Student be placed at Options, a private special education program approved by the state of Connecticut.  *Id.* at 175; Ex. B-52 (6/2/2014 PPT record).

Options' "goal is to improve students' academic skills for completion of high school graduation requirements and to increase their competitive abilities for employment, independent living, and post-secondary education" through "one-to-one, guided programs."  Ex. P-43 (Options brochure).  Scott Wells,

Options' Owner and Director, has a Masters in Counseling Psychology and 22 years of experience providing transitional training to special education students, including three years with West Hartford Public Schools.  Ex. P-42 (Wells resume).  Options professes its teachers and counselors "have extensive experience in a range of educational and vocational fields."  Ex. P-43 (Options brochure).

Parents ultimately rejected the PPT's plan to place Student in ACHIEVE rather than Options.  Ex. B-52 (6/2/2014 PPT record).  Parents also requested two years of compensatory education at the June 2, 2014 PPT, which they attended with legal counsel.  *Id.*  The hearing in this matter, which Parents requested on March 24, 2014, took place over seven days from June 9, 2014 through August 26, 2014.  [Dkt. No. 1 (Complaint), Ex. 1 (Hearing Officer's Decision) ("HO Decision") at 2].

## II.    Legal Standard

Parents move for this Court to overrule the final decision of the Due Process Hearing Officer and find the Board in violation of 20 U.S.C. § 1400 ("IDEA") and regulations thereunder.  Mot. at 1; SAC at 45.  IDEA "'represents an ambitious federal effort' to ensure that all children are given access to a public education regardless of any disabilities they may suffer."  *A.S. v. Trumbull Bd. of Educ.,* 414 F. Supp. 2d 152, 169 (D. Conn. 2006) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).  Under IDEA, states receive federal funding to "develop educational plans that are 'reasonably calculated' to ensure that all children with disabilities receive a FAPE."  *Id.* at 169.  "A party dissatisfied with a proposed

education plan may challenge it in an administrative hearing, in which the [challenging] party bears the burden of proving the plan to be inadequate." *Id.*

If a party is dissatisfied with the findings and decision of the administrative hearing officer, the party may bring a civil action in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." *Rowley*, 458 U.S. 176 at 204-05 (*quoting* 20 U.S.C. § 1415).  The civil action may concern "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* at 204-05 (quoting 20 U.S.C. § 1415).  The reviewing court "shall receive the record of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id*; *see also Hardison v. Bd. of Educ. of Oneonta City Sch. Dist.*, 773 F.3d 372, 386 (2d Cir. 2014) ("The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence.").

Courts reviewing administrative decisions under IDEA must determine whether they are "reasoned and supported by the record." *Galiardo v. Arlington Cent. Sch. Dist.*, 489 F. 3d 105, 114 (2d Cir. 2007).  Courts apply a "preponderance of the evidence" standard to the inquiry.  20 U.S.C. § 1415(i)(2)(C)(iii); *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003).  The Court's review should be "independent, but deferential [to the] hearing officer's decision." *A.E. v. Westport Bd. of Educ.*, 463 F. Supp. 2d 208, 215 (D. Conn. 2006).  Courts

determine how much weight to give an administrative decision under IDEA based on the "quality and thoroughness of the reasoning, the type of determination under review, and whether the decision is based on the administrative body's familiarity with the evidence and the witnesses." *Haridson*, 773 F.3d at 386; *see also P. ex rel Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118 (2d Cir. 2008).

Where the administrative ruling hinges on a question of education policy, the Court must show "substantial deference." *A.E.*, 463 F. Supp. 2d at 215. "The Supreme Court has cautioned that courts should not substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* Courts are to be "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Cerra v. Pawling Central School District*, 427 F.3d 186, 192 (2d Cir. 2005); *see also Hardison*, 773 F.3d at 386.

Conversely, "a hearing officer's interpretations of statutes or the federal constitution are afforded no deference." *Trumbull Bd.*, 414 F.Supp.2d at 173 (quoting *Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005)).

Lastly, the burden of proof in an IDEA context differs from that of a traditional summary judgment motion:

> Courts that decide summary judgment motions on IDEA appeals are not dealing with summary judgment in its traditional setting. Summary judgment in IDEA actions is the most pragmatic procedural mechanism for resolving IDEA actions. When deciding a summary judgment motion in the IDEA context, a court's inquiry is not directed to discerning whether there are disputed issues of fact, but rather

whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed.  Therefore, it matters not, in the context, who initiates the motion.

*Westport Bd. of Educ.*, 463 F. Supp. at 214-15.  Therefore, in reviewing the claims the Court is not focusing on the presence or absence of issues of material fact, but instead contemplates whether the record establishes that the hearing officer's decision comports with applicable legal standards.

### III.      Analysis

Parents allege the hearing officer incorrectly found the Board committed only minor procedural violations of IDEA which did not deny Student FAPE.

#### A.  The propriety of the Board's procedure under IDEA

While procedural flaws do not automatically constitute a denial of FAPE, "procedural flaws that result in the loss of an educational opportunity, or that seriously infringe the parents' opportunity to participate in the IEP formulation process . . . 'clearly result in the denial of a FAPE.'"  *A.E.*, 463 F.Supp.2d at 216 (quoting *W.A. v. Pascarella*, 153 F. Supp. 2d 144, 153 (D. Conn. 2001)).  A procedural error warrants relief if it "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of educational benefits."  *M.H. v. N.Y. City Dep't of Ed.*, 685 F.3d 217, 245 (2d Cir. 2012) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).

In this case, Parents argue the Board failed to meet its duty to identify Student's special needs in a timely manner (the "child find" obligation), and inappropriately evaluated Student.

1.   **The Child Find Obligation**

a.   **Timeliness of Parents' child-find claim**

The parties dispute when the statute of limitations on Student's "child-find" IDEA claim begin to run.  The Defendants assert that the statute of limitations began to run on March 24, 2012.  Opp. at 20; Reply at 3.  Under IDEA, a party may request a hearing up to two years after the school board "declines to make the educational change desired by the parents or at the time it proposes an educational change that the parents deem unsuitable."  *M.D. v. Southington Bd. of Ed.*, 334 F.3d 217, 221 (2d Cir. 2003); *see also* Conn. Agencies Regs. § 10-76h-4(a) (regulation governing enforcement of IDEA claims in Connecticut).  If the parent or guardian does not receive actual notice of IDEA's procedural safeguards, the two-year limitation period "shall be calculated from the time notice of the safeguards is properly given."  *Id.* at 220 (noting the two-year statute of limitations for IDEA claims begins when the party has actual notice that a period of limitation is running against it, even if the party gains actual notice from a source other than the school board); Conn. Agencies Regs. § 10-76h-4(a).[5]

Here, Parents received actual notice of IDEA's procedural safeguards at the January 31, 2012 504 meeting.  Administrative Record, Ex. B-2 (1/31/2012 504 record); 6/17/14 Hearing Transcript (Father's testimony) at 55.  On March 24, 2014, Parents signified their dissatisfaction with the change the School proposed for

---

[5] **The Court looks to Connecticut state court decisions interpreting Section 10-76h(a)(3) as it is an equitable tolling provision, and federal courts "borrow state equitable tolling rules."** *M.D.*, 334 F.3d at 223; *see also Hardin v. Straub*, 490 U.S. 536, 539 (1989) (stating federal courts must borrow a state's equitable tolling rules unless doing so "would defeat the goals of the federal statute at issue").

Student by requesting an IDEA hearing on March 24, 2012. HO Decision at 2. Accordingly, the Hearing Officer correctly determined that any evidence preceding March 24, 2012 was barred by the limitations period. *Id.* at 13.

### b. The merits of Parents' child-find claim

As to the merit of Parents' child-find allegation, IDEA imposes on the Board an obligation to "have in effect policies and procedures that ensure that . . . [a]ll children with disabilities . . . who are in need of special education and related services, are identified, located and evaluated." 34 C.F.R. § 300.111(a) (2006). The child-find obligation extends to "[c]hildren who are suspected of being a child with a disability . . . even though they are advancing from grade to grade." *Id.* at § 300.111(c); *see also M.A. v. Torrington Bd. of Ed.*, 980 F. Supp. 2d 245, 264 n.22 (D. Conn. 2013); *A.P. ex rel. Powers v. Woodstock Bd. of Ed.*, 572 F. Supp. 2d 221, 224–25 (D. Conn. 2008).

To establish a procedural violation of the child-find obligation, "the school officials must have overlooked clear signs of disability, [been] negligent in failing to order testing, or have no rational justification for not deciding to evaluate. *Regional Sc. Dist. No. 9*, No. 3:07-cv-1484 (WWE), 2009 WL 2514064, *11 (D. Conn. Aug. 7, 2009). Once the Board identifies a student who may qualify for special education and secures parental approval to conduct an evaluation, the initial student evaluation "must be conducted within 60 days of receiving parental consent for the evaluation or, [i]f the State establishes a timeframe within which the evaluation must be conducted, within that timeframe." 34 C.F.R. § 300.301(c)(1). After an initial PPT, Connecticut has instituted a 45 school day timeline for executing an IEP. Conn. Agencies Regs. § 10-76d-13(a)(1).

Events preceding March 24, 2012 are untimely but may provide evidence of a child-find violation from March 24, 2012 through June 11, 2012, when Student was deemed eligible for special education.  Conn. Agencies Regs. § 10-76h-4 (stating the two-year statute of limitations to request a FAPE hearing does not apply to evidence); *see also* M.D. v. Southington Bd. of Ed., 334 F.3d 217, 221 (2d Cir. 2003); P. v. Greenwich Bd. of Ed., 929 F. Supp. 2d 40, 48 (D. Conn. 2013). Between Student's first hospitalization, in December 2011, and the Board's award of special education in June 2012, the Board held six meetings with Parents and two additional school psychological evaluations.  The first meeting was on December 8, 2011, during which the Board met with Parents to discuss reducing Student's workload and assisting him with organizational skills.  HO Decision at 4 (referencing December 2011 meeting).  On January 31, 2012, the Board held a meeting under Rehabilitation Act Secion 504. Administrative Record, Exs. B-2 (1/31/2012 504 Meeting Record).  In February, the Board arranged for home tutoring after Student's school attendance declined.  *Id.* at B-16 (homebound instruction progress report).  The Board conducted a PPT in March, after Parents referred Student for special education.  *Id.* at B-3 (3/12/2012 PPT Record).  At that third meeting, the Board determined Student's condition was not of sufficient longevity to qualify him for special education and scheduled a follow-up PPT for April 23, 2012.  *Id.*  At that fourth meeting, the Board learned that Student had been hospitalized again and decided to continue homebound tutoring.  *Id.* at B-4 (4/23/2012 PPT Record).  On May 9, 2012, the Hall High School psychologist evaluated Student, administered the BASC-2, and based on that assessment

recommended a special education mandate. *Id.* at B-5 (5/9/2012 Evaluation).  On May 10, 2012, the District psychiatrist conducted a consultation and noted that Student's symptoms declined while being tutored at home, and recommended that Student be enrolled in STRIVE.  *Id.* at B-6 (5/10/2012 Evaluation).  The PPT met again on May 17, 2012, and again on June 11, 2012, at which later meeting the Board declared Student eligible for special education.  *Id.* at B-7 (5/17/2012 PPT Record); B-8 (6/11/2014 PPT Record).

The sequence of events between December 2011 and March 24, 2012 establish that the Board attentively monitored Student's developing special needs. The Board's decision to continue monitoring Student from March 24 until April 23 to determine whether Student's condition was long lasting as required for special education eligibility, and then to initiate the evaluation process, was supported by a preponderance of the evidence.  *See, e.g.*, *Mr. N.C. v. Bedford Cent. Sch. Dist.*, 300 F. App'x 11, 13 (2d Cir. 2008) (finding denial of special education eligibility appropriate where student displayed depression, declining grades, and a single major depressive episode); *R.E. v. Brewster Cent. Sch. Dist.*, 15 cv 4562 (RMB), 15 Civ. 4562 (RMB), 2016 WL 2606535, at *4 (S.D.N.Y. Mar. 30, 2016) (finding preponderance of the evidence supported board's decision not to evaluate student in the fall semester when student's grades dropped and student was diagnosed with ADHD, but to evaluate student months later when student's condition had more clearly deteriorated).  Even if the Board had reason to suspect Student had a disability on March 24, less than a month is a "reasonable time" to wait before initiating an evaluation. *Murphy v. Town of Wallingford*, No.

3:10–cv–278 (CFD), 2011 WL 1106234, at *3 (D. Conn Mar. 23, 2011); *Reg'l Sch. Dist. No. 9,* 2009 WL 2514064 at *8 (explaining Courts generally find an "unreasonable delay" when a board waits six months or more between having reasonable suspicion and initiating an evaluation). Here, the Board gathered and evaluated the evolving facts and structured and restricted educational services for Student in a procedurally responsive, methodical, progressive and timely manner. The Hearing Officer correctly determined that there was no child-find violation. HO Decision at 13.

### 2.   Sufficiency of the Board's Evaluation

Parents allege the Board failed to follow the appropriate procedure for evaluating Student in a number of ways, each of which is addressed below.

Once a school identifies a student requiring special education, the school district must convene a Planning and Placement Team Meeting ("PPT"). 20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320(a). At the PPT, the student's parents or guardians, regular and special education personnel, and any other individuals with relevant expertise invited by the parents or guardians, conduct an individualized inquiry into the student's needs. 20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320(a). Participants in the PPT develop an Individualized Education Program ("IEP"), which identifies a student's level of educational performance, measurable goals, and the educational program and services and accommodations that are to be provided. 20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320(a). The IEP must be reviewed at least once per year, and it should be periodically revised in response to information provided by the parents and staff as well as ongoing evaluations of the child's progress. *See* 20 U.S.C. § 1414(d);

34 C.F.R. §§ 300.320 – 300.324; Conn. Agencies Regs. §§ 10-76d-10 – 12.

> a. **Failure to base the special education determination on a thorough evaluation**

Parents contend that the Board failed to conduct an appropriate evaluation of Student, specifically by failing to conduct a writing evaluation or other cognitive testing.  Mot. at 23.  The Board counters that they were only obligated to evaluate Student's suspected disability, which was an emotional disturbance.  Opp. at 24-25.

A board is required to assess all areas related to the suspected disability when determining a Student's special education eligibility.  34 C.F.R. § 300.304(c)(4).  In doing so, a board may not rely on only one evaluation tool to assess a student, but instead must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, and must not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability."  *Id.* at (b).

Student's suspected disability was emotional disturbance; Parents informed the Board of Student's psychiatric hospitalizations, suicidal and homicidal ideations, which led to the decision to evaluate him.  *See* Administrative Record, Ex. B-4 (4/23/2012 PPT record) (indicating PPT decided to evaluate Student based on suspected emotional disturbance).  Appropriately, the Hall psychologist conducted a BASC-II evaluation and interview of Student, and the District psychiatrist conducted an additional consultation.  Administrative Record, Ex. B-5 (5/9/2012 Evaluation), Ex. Ex. B-6 (5/10/2012 Evaluation).  The Board ultimately determined, based on multiple evaluations, that Student was

eligible for special education on that basis.  Administrative Record, Ex. B-5 (5/9/2012 Evaluation), Ex. Ex. B-6 (5/10/2012 Evaluation); Ex. B-8 (6/11/2012 PPT record).  The Hearing Officer's determination that the PPT's assessment was sufficiently thorough is supported by a preponderance of the evidence.

> b.  **Failure to include a regular education teacher at the May 22, 2013 PPT**

Parents assert the May 22, 2013 PPT was procedurally improper because it did not include a regular education teacher.  Mot. at 23.  Parents are correct that an IEP team must include "not less than one regular education teacher of the child (if the child is, or may be, participating in the regular education environment)."  20 U.S.C. § 1414(d)(4)(B)(ii).  The regular education teacher "shall, to the extent appropriate, participate in the development of the IEP of the child."  *Id*. at (d)(4)(C).

Holding a PPT without a regular education teacher is not a *per se* procedural violation of IDEA.  *K.L.A. v. Windham Southeast Supervisory Union*, 371 F. App'x 151, 154 (2d Cir. 2010).  In this case, Student was not participating in regular education.  Student was enrolled in STRIVE at the time of the May 22, 2013 meeting and had received homebound tutoring prior to his enrollment in STRIVE.  Administrative Record, Ex. B-13 (5/22/2013 PPT record).  Further, Student's special education teacher, David Volpe, was present.  *Id*.  The facts support the Hearing Officer's determination that the absence of a regular education teacher from the May 22, 2013 PPT did not constitute a procedural IDEA violation.

### c. Failure to address Parents' third-party psychologist's report at the October 28, 2013 PPT

Parents also allege the Board impermissibly disregarded a psychological evaluation conducted by Dr. Isenberg, Student's psychologist, when conducting the September 20, 2012 PPT.  Mot. at 24.

An independent evaluation "must be considered by the public agency, if it meets agency criteria, in any decision with respect to the provision of FAPE to the child."  34 C.F.R. § 300.502(c)(1).  The record indicates that the PPT considered Dr. Isenberg's evaluation on September 20, 2012.  Administrative Record, Ex. B-12 (9/20/2012 PPT record) (stating the PPT was convened to "review a neuropsychological evaluation administered by Dr. Isenberg"), 6/9/2014 Hearing Transcript at 106 (stating the September 20, 2012 PPT reviewed Student's independent neurological evaluation).

The Board was not required to implement all of Dr. Isenberg's suggestions, but rather to consider his evaluation.  34 C.F.R. § 300.502(c)(1).  The Hearing Officer accurately concluded the Board fulfilled this obligation; there was no procedural violation of FAPE on this ground.

### d. Failure to allow Parents meaningful participation throughout the relevant period

Parents also assert they were denied meaningful participation in Student's special needs procedure when the Board failed to provide the Parents with a copy of the May 22, 2013 IEP until after November 2013 and failed to provide specific information about proposed programs, including qualifications of

paraprofessionals that would work with Student.[6]  Mot. at 25.

Parents possess an unquestionable right to notice and an opportunity to attend and participate in "meetings with respect to the identification, evaluation and educational placement of the child, and the provision of a free appropriate public education to such child."  *Cerra*, 427 F.3d at 192 (quoting 20 U.S.C. § 1415(b)(1)).  Parental "participation means something more than mere presence; it means being afforded the opportunity to be an equal collaborator, whose views are entitled to as much consideration and weight as those of other members of the team in the formulation and evaluation of their child's education."  *Pascarella*, 153 F. Supp. 2d at 154 (quoting *V.W. v. Favolise*, 131 F.R.D. 654, 659 (D. Conn. 1990)).

Parents correctly assert the Board's failure to provide Parents with a copy of Student's May 22, 2013 IEP until after November 2013 violates IDEA.  Conn. Agency Regs. § 10-76d-13(a)(6) ("a full copy of the individualized education program shall be sent to the parents within five days after the planning and placement team meeting to develop, review or revise the individualized education program").  However, procedural errors alone do not necessitate relief unless they "impeded the child's right to a [FAPE]; significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a [FAPE]; or caused a deprivation of educational benefits."  20 U.S.C. §

---

[6] Parents also allege refusal to evaluate Student, refusal to conduct a comprehensive assessment of Student, adequacy of homebound tutoring, and adequacy of Student's vocational programming.  Mot. at 35.  Those allegations are addressed elsewhere in this Decision, and need not be re-evaluted here.

1415(f)(3)(E)(ii); *see also M.H.*, 685 F.3d at 245.  Parents have asserted no facts indicating that this delay impeded Student's right to FAPE or caused a deprivation of educational benefits.  Parents also do not assert the delay caused a significant imposition on the parents' opportunity to participate in the decision-making process – Parents attended every PPT and do not allege they were not aware of what programming was selected for Student throughout the relevant time period, and are therefore not entitled to reversal on this basis.

Parents' allegation that the Board failed to deliver details about paraprofessionals' qualifications in the ACHIEVE program also does not require reversal.  Parents have a right to meaningfully participate in meetings to develop an appropriate IEP, but do not have a limitless right to "conversations on issues such as teaching methodology, lesson plans, or coordination of service provision."  34 C.F.R. 300.501(b)(3); *see also generally J.C. ex rel. C. v. New Fairfield Bd. of Ed.*, 3:08-cv-1591 (VLB), 2011 WL 1322563, *16 (D. Conn. Mar. 31, 2011) (stating rights of parents to develop special education plans are "not limitless," and "a PPT is not required to adopt the parents' recommendations").

Even if the Board wrongfully withheld information about the paraprofessionals' qualifications, doing so is not symptomatic that ACHIEVE was not a substantively appropriate program.  ACHIEVE's graduate data and staff qualifications soundly support the conclusion that its paraprofessionals were reasonably qualified to meet Student's needs.  Administrative Record, Ex. B-49 (ACHIVE graduate data); 7/7/2014 Hearing Transcript (Pettinelli testimony) at 63-64, 42-43, 132 (stating two of the paraprofessionals who work in the ACHIEVE

program have over twenty-five years of experience each, two others have worked

with ACHIEVE for eight or more years, and that Ms. Pettinelli has provided

services to students who are on the autism spectrum and have psychosis while

working at ACHIEVE).  The Board's failure to notify Parents of this fact does not

render ACHIEVE inappropriate or constitute a denial of FAPE.

> 3.  **The Hearing Officer's findings regarding procedural violations of IDEA**

Parents note that the Hearing Officer found multiple procedural IDEA

violations, but concluded they did not rise to the level of depriving Student of

FAPE, and as such warranted no relief.  Mot. at 26.  Among the procedural

violations the Hearing Officer identified are failure to provide Student with

consistent programing, providing inaccurate IEP's and failing to identify

evaluative data from which the IEP was created.  HO Decision at 17.  The Hearing

Officer also found that the June 12, 2012 IEP provided to Parents contained

inaccuracies regarding the nature of services Student would receive, and

wrongfully omitted the evaluation procedure, assessments, records or reports

used as a basis for the actions proposed.  *Id.* at 7.  The Court defers to the

Hearing Officer's decision; even including the procedural error of failing to

provide Parents a copy of the May 22, 2013 IEP until after November 2013, a

preponderance of the evidence supports the conclusion that Student made

meaningful academic progress and was not denied FAPE due to procedural

errors.

> B.  <u>Whether Student received FAPE sufficient under IDEA</u>

In addition to procedural claims, Parents assert the programming provided

by the Board was insufficient, and as such substantively violated IDEA.  The Court addresses each of Parents' allegations below.

To establish a violation of the IDEA's substantive requirements, a party must show that the revised "individualized education program developed through the Act's procedures" was not "reasonably calculated to enable the child to receive educational benefits."  *See Rowley*, 458 U.S. at 206-207.  In reviewing this claim, the Court must keep in mind that a district is not required to furnish "every special service necessary to maximize each handicapped child's potential."  *Id.* at 207; *Cerra*, 427 F.3d at 196.  "Instead, the IDEA is satisfied if the school district 'provides an IEP that is likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *Trumbull Bd. of Educ.,* 414 F. Supp. 2d at 173.

Courts "must afford some deference to the findings of the hearing officer, and may not substitute in place of the administrative decision the personal education philosophy of the court."  *P.J. by and through W.J. v. State of Conn. Bd. of Ed.,* 788 F. Supp. 673, 679 (D. Conn. 1992).

### a. Sufficiency of homebound tutoring provided to Student in February 2012

Parents allege the Board assigned Student four to six hours per week of homebound tutoring in February 2012, which is insufficient under IDEA.  Mot. at 21.  Parents are correct that Connecticut requires a minimum of ten hours per week of homebound instructional time unless an evaluation determines ten hours is too much for the student.  C.G.S. § 10-76d-16(d).  As addressed in part III(a)(i)(1) above, evidence predating March 24, 2012 will be considered only as further

evidence in support of a timely allegation.

The April 23, 2012 PPT increased Student's tutoring to eight hours per week upon determining Student's "medications have been useful" and he "has been very cooperative with tutoring."  Administrative Record, Ex. B-4 (4/23/2012 PPT record).  On May 10, 2012, the PPT found that Student continued to do well with tutoring, but that "recently it has been inconsistent on the part of the tutor," and compensatory education would be provided to Student until he completed his tenth grade coursework.  *Id.*, Ex. B-7 (5/10/2012 PPT record).

A preponderance of the evidence indicates the PPT assigned Student less than ten hours per week of homebound tutoring tailored to the Student's needs, raised the number of hours per week when evidence showed Student could handle it, and provided compensatory tutoring until Student finished his coursework.  The records establish that the frequency of homebound tutoring provided to Student was largely appropriately tailored to his needs, and did not measurably deprive Student of the educational benefits to which he was legally entitled.

> b. Sufficiency of STRIVE, specialized education provided from 2012 through 2014

Parents argue the specialized programming offered to Student for the 2012-2013 school year, "STRIVE," was deficient on a number of grounds.  Parents assert STRIVE was not academically challenging enough for Student because STRIVE courses did not assign homework, were taught by only three teachers, and used a limited curriculum whereby Student was forced to repeat two courses he had already passed.  *Id.* at 28.  Parents also argue that STRIVE failed to meet

Student's social, emotional, and behavioral needs.  Mot. at 29.  STRIVE required Student to participate in group therapy, which Parents allege provided Student no benefit.  *Id*. at 29-30.  Parents also assert STRIVE failed to improve Student's violent tendencies, as Student continued to make violent threats and once punched a fellow student repeatedly with such force Student broke his hand.  *Id*. at 30.

The Supreme Court rejected the argument that school districts are required to provide services "sufficient to maximize each child's potential commensurate with the opportunity provided other children."  *Rowley*, 458 U.S. at 198.  IDEA guarantees access to "some form" of "adequate, publicly supported" special education, but does not "guarantee any particular level" of education.  *Id.*  at 192-95; *Walczak v. Fl. Union Free Sch. Dist.*, 142 F.3d 119, 129-133 (2d Cir. 1998); *M.H. v. N.Y.C. Dept. of Educ.*, 685 F.3d 217, 245-46 (2d Cir. 2012).

Parents' allegations characterize STRIVE as a non-ideal program with limited curriculum that did not maximize Student's learning experience and group therapy sessions that did not benefit Student.  However, IDEA does not demand an optimal learning environment.  *Rowley*, 458 U.S. at 192.  While enrolled in STRIVE, Student improved his grades and passed the CAPT statewide exam. Administrative Record, Ex. B-13 (5/22/2013 PPT record) (indicating Student earned a 3.0 GPA at STRIVE); Ex. B-39 (Student's CAPT scores and test information).  Student also experienced social and emotional improvements at STRIVE.  Administrative Record, Hearing Transcript (Urso testimony) at 102-03 (stating Student's "social skills have grown tremendously" and that Student

behaved "at the highest level").  Student's mother acknowledged that STRIVE "was influential in assisting [Student]," and that "the environment and support he receive[d at STRIVE] have allowed [Student] to gain self-confidence and envision his future."  Administrative Record, 6/17/2014 Hearing Transcript (Mother testimony) at 175-76.

The administrative record soundly supports the conclusion that STRIVE not only constituted an adequate education under IDEA, but that Student showed substantial academic and social improvement in the program.  The Hearing Officer correctly determined that STRIVE constituted a FAPE under IDEA.

### c.  Failure to provide transitional programming before student reentered regular education

Parents further assert the Board inappropriately transitioned Student from STRIVE back to regular education classes at the main high school for the 2013-2014 school year.  Mot. at 30-31.  Parents contend the Board created no plan to transition Student back into the regular education environment, and provided Student no case manager, counselling, or special education services while at the main high school.  *Id.* at 31.  Parents allege that it is because of this lack of transitional programming that Student skipped classes, began having increased suicidal ideations, and had to reenter STRIVE.  *Id.* at 30-31.

Parents' allegations regarding a lack of transitional programming before Student reentered a regular education environment in 2013 fails to constitute a denial of FAPE.  The PPT appropriately based its decision to reintroduce Student to a regular learning environment based on Student's progress at STRIVE and meetings with Parents and the school guidance counsellor.  Administrative

Record B-13 (5/22/2013 PPT record).  Transitional services are not *per se* required under IDEA, and the Board correctly notes that IDEA requires an IEP to be "reasonably calculated to enable the child to receive educational benefits . . . but it cannot guarantee totally successful results."  *Walczak*, 142 F.3d at 129-133. There is ample evidence in the record to support the conclusion that the Board did not deny Student FAPE by failing to foresee that Student would not transition back to regular education smoothly on his own.

### d.  Sufficiency of transitional programming

Parents' allegation that the Board's failure to provide transitional training for summer 2014, before Student entered ACHIEVE, also fails.  Mot. at 38-39. Student received introductory vocational training at STRIVE during the 2013-2014 school year, including building a list of goal careers, listening to guest speakers, and part-time work.  Administrative Record, Ex. B-52 (6/2/2014 PPT record) (indicating Student participated in a vocational training class through STRIVE).[7]

In addition, ACHIEVE holds an annual orientation for new students before beginning the program.  Administrative Record, Ex. B-46 (ACHIEVE policy) ("In May, there is a program orientation for all new incoming students.  Students spend a day in the program to learn about the program from staff and current students.").  Student declined to participate in the ACHIEVE orientation, but his mother toured the Achieve facility with Ms. Pettinelli, ACHIEVE's coordinator.

---

[7] The Career and Vocational Education class ("CAVE") allowed Student to apply for jobs, take on supervised, part-time work, engage with guest speakers about different careers, and develop a list of goal career options.  Administrative Record, Ex. B-40 (CAVE timeline of transitional activities), Ex. B-52 (6/2/2014 PPT record) (listing vocational training activities Student completed at STRIVE.

Administrative Record, 6/17/2014 Hearing Transcript (Mother's testimony) at 181-82.

In addition to the orientation, the June 2, 2014 PPT recommended extended school year programming consisting of work experience four to five days per week from 8:30am to 12:30pm with a one-on-one job coach.  Administrative Record, Ex. B-52 (6/2/2014 PPT record), 6/17/2014 Hearing Transcript (Mother's testimony) at 170-71.  This transitional training, provided through ACHIEVE, would constitute a shortened version of the daily activities ACHIEVE provides. Administrative Record, Ex. B-52 (6/2/2014 PPT record).  The Hearing Officer's determination that these early vocational experiences provided adequate transitional training before Student was to begin ACHIEVE is supported by the record.

> e. Sufficiency of ACHIEVE, special education offered for 2014-2015 school year

At the end of Student's senior year, the Board determined he required additional training to prepare for life after graduation under IDEA.  Parents allege the program proposed, ACHIEVE, would not have constituted a FAPE.  Mot. at 42-44.

A special needs student aged sixteen or older must have an IEP determining "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employments, and, where appropriate, independent living skills" and "the transition services . . . needed to assist the child in reaching those goals."  20 U.S.C. § 1414(d)(1)(A)(i)(VIII).  A school board is required to evaluate a student and provide

an IEP until the student graduates with a regular diploma or exceeds the age of eligibility for a FAPE under state law.  *Id*. at § 1414(c)(5)(B).  In Connecticut, a student is eligible for special education until the end of the school year in which the student turns 21.  Conn. Agencies Regs. § 10-76h-1(c) (defining "child" as "an individual under twenty-one years of age who is eligible for or may be eligible for special education and related services"); Conn. Gen. Statute 10-186 (stating each child between five and twenty-one years old who is not a graduate of a high school or vocational school may attend public school).  The school board has discretion to determine whether a child has satisfied credit requirements to graduate.  Conn. Gen. Statute 10-221a(f).

Here, the June 2, 2014 PPT determined that Student was "on track to graduate" at the end of the 2013-2014 school year, his senior year, with 19 credits and a 3.0 GPA.  Administrative Record B-52 (6/2/2014 PPT record).  However, the PPT determined Student required transitional career training through ACHIEVE for the 2014-2015 school year, in accordance with IDEA.  *Id.*; 20 U.S.C. § 1414(d)(1)(A)(i)(VIII).  Parents rejected ACHIVE as inappropriate for Student.

Parents spend significant time detailing the safety concern ACHIEVE would cause by placing Student on job sites with no supervision, without an evaluative check-in until three to four months into the school year, and without sufficiently individualized curriculum.  Mot. at 42-44.  Parents also contend the IEP developed for Student's time in ACHIEVE was based on the ACHIEVE curriculum rather than an interview with Student or review of Student's records, and was accordingly insufficiently personalized.  *Id*. at 33.

Contrary to Parents' assertion, ACHIEVE provides "full staff support" at job sites for all students in their first year, and as necessary in subsequent years. Administrative Record, Ex. B-46 (ACHIEVE policy).  Additionally, the June 2, 2014 PPT recommending ACHIEVE explicitly states Student would have a one-on-one job coach to address his individual needs.  *Id.*, Ex. B-52 (6/2/2014 PPT record).

As to the goals outlined in the IEP, Ms. Pettinelli, ACHIEVE's coordinator, did not review Student's records before she drafted goals for Student, however she did research his background prior to establishing the goals.  She met with Student's teachers at STRIVE, his case manager, and a transition coordinator who worked directly with student.  7/7/2012 Hearing Transcript (Pettinelli testimony) at 48-50.  Further, the goals were adopted by the PPT which included members who were intimately involved with Student's record.  *Id.*, Ex. B-52 (6/2/2014 PPT record) (indicating Ted Dillon, David Volpe, and Lorri Fitzsimmons participated in the PPT); 6/9/2014 Hearing Transcript at 106 (stating Mr. Volpe, Student's case manager, and Mr. Dillon, an administrator, participated in Student's PPTs as early as September 20, 2012, and reviewed Student's independent neurological evaluation); Ex. B-12 (9/20/2014 PPT record) (reflecting Mr. Dillon, Mr. Volpe, and Ms. Fitzsimmons, Student's social worker, were all present at that PPT).

The Hearing Officer reasonably concluded the IEP adopted at that meeting reflected each PPT participant's understanding of Student's condition and the proposed program.  While Parents perhaps would have preferred more

individualized goals for ACHIEVE, the record indicates the program and goals developed were at least adequate under *Rowley*, 458 U.S. at 192. [8]

i.   Sufficiency of transportation provided in
conjunction with ACHIEVE

Parents also assert that Student must be provided private transportation to and from job sites, as he is at risk of violent outbursts that could cause harm to others on public transportation.  Mot. at 45.  The Hearing Officer found that Student requires private transportation through ACHIEVE until the PPT determines he is emotionally ready to begin public bus training.  Op. at 7. Parents assert this is insufficient, as Student's clinician stated Student will always be at risk of hurting someone, and therefore, Parents assert, he will never be emotionally ready for public transportation.  Mot. at 45.

Parents' concern is adequately addressed by the Hearing Officer's instruction that Student will transition to public transportation *only if* the PPT, in which Parents participate, determines Student is ready.  Op. at 7.  The Hearing Officer's added precaution that Student would go through transitional training before using public transportation, should the PPT ever determine he is stable enough to do so, is adequately tailored to Student's specific needs under IDEA. *Id*.

---

[8] Parents assert an alternative program, "Options," would have provided better one-on-one transitional training than ACHIEVE.  Mot. at 39-44.  The Court need not determine whether Options, a privately run, for-profit transitional service, would be the *best* place for Student.  The Hearing Officer's determination that ACHIEVE provided adequate transitional education under IDEA was not clear error, and adequate educational services are all IDEA requires.  *Rowley*, 458 U.S. at 192.

IV.   Remedies available to Parents

Parents allege the Hearing Officer's denial of compensatory education was not supported by the record and should be overturned.  Mot. at 45. Compensatory education is appropriate where the student has been denied FAPE, and should be fashioned to make up for that denial.  *P. ex rel Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 117 (2d Cir. 2008); *A. v. Hartford Bd. of Educ.*, 3:11-cv-1381-GWC, 2016 WL 3950079, at *12 (D. Conn. July 19, 2016) (slip copy).[9]

The Hearing Officer found the Board failed to provide adequate transportation to and from ACHIEVE, but mandated that the Board remedy the inadequacy in its October 2, 2014 Final Decision.  HO Decision at 17.  The remedy the Hearing Officer mandated sufficiently resolved the deprivation.

The Hearing Officer also found procedural errors including "drafting inaccuracies, incomplete IEP documents and failing to provide consistent programming for the Student," which the Hearing Officer found did not amount to a denial of FAPE.  Op. at 17.  In addition to the Hearing Officer's findings, with which the Court agrees, the Court has found a procedural failure to provide a copy of the May 22, 2013 IEP until after November 2013.  *See* section III(ii)(4) above.  However, Parents offered no evidence establishing that the delay caused a denial of FAPE, nor does it, even considered in conjunction with the procedural

---

[9] Parents need not establish a "gross violation" of IDEA in order to qualify for compensatory education, as the gross violation requirement applies to students over the age of 21.  *P. ex rel. Mr. P.*, 512 F. Supp. 2d at 113 n.13; *Hartford Bd. of Educ.*, 2016 WL 3950079 at *12.  Per this Court's records, Student is currently 20 years old.

violations the Hearing Officer noted.  Compensatory relief is accordingly inappropriate.

V.    Conclusion

Pursuant to the foregoing analysis, Plaintiffs' motion for judgment on the administrative record [Dkt. 32] is DENIED and Defendants' cross-motion for judgment on the administrative record [Dkt. 34] is GRANTED, in accordance with this Decision.  Further, as Plaintiffs do not allege any causes of action against Superintendent Thomas Moore or Director of Pupil Services Glenn McGrath, they are hereby DISMISSED as defendants, without prejudice.  The Clerk is directed to close this file.

SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Hartford, Connecticut:  September 29, 2016.